UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA :

v. : 21-cr-568 (CJN)

KENNETH JAVON HALE :

DEFENDANT'S MOTION FOR
DOWNWARD DEPARTURE AND SENTENCING MEMORANDUM

On October 6, 2021, Kenneth Jevon Hale[1] entered a guilty plea to one count of distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2). He will appear before this Honorable Court for sentencing on June 13, 2022. He is a 48-year-old veteran of the United States Army, who served honorably for twenty years, including two tours of combat service in Iraq. He has no prior convictions, and his participation in the instant offense occurred over a short period of time and was the result of a mental health crisis triggered by his separation from his wife and rooted in post-traumatic stress disorder ("PTSD"), stemming from victimization when was a child, as well as tragedies he witnessed while serving in the military. Mr. Hale does not meet the diagnostic criteria for paraphilic or pedophilic disorder and poses a low-risk of recidivism. Although the applicable recommended sentencing range under the United States Sentencing Guidelines ("U.S.S.G.") is 108 to 135 months incarceration, the Court should grant a downward departure based on Mr. Hale's military service pursuant to U.S.S.G. § 5H1.11, and as the Probation Office has recommended, the Court should vary from the applicable range based on Mr. Hale's background and characteristics, along with the limited nature of the offense. The Court should disregard the government's sentencing recommendation because it is based largely on a false allegation, not the offense conduct. A sentence of no more than the mandatory

---

[1] The Information misspelled Mr. Hale's middle name. The correct spelling is "Jevon."

minimum term of 60 months incarceration is sufficient but not greater than necessary to serve the purposes of sentencing.

## **Factual Background**

 Mr. Hale was born in Bluefield, West Virginia, and raised by his mother and stepfather, along with his stepsister and stepbrother. The family moved frequently to follow his stepfather's jobs as a construction worker. His stepfather was an alcoholic and abusive toward his mother and the children, which negatively affected all three children. Mr. Hale has struggled with controlling his alcohol consumption, and his siblings struggled with drug addiction—his stepsister died of an overdose in 2006, and his stepbrother died of an overdose in 2015.

When he was just eight years old, Mr. Hale was violently attacked and raped by a 16-year-old man who was a relative of his stepfather. Following the attack, Mr. Hale felt ashamed and embarrassed. He did not report the attack, but suffered silently for many years. As a teenager, he experienced severe anxiety and depression. He engaged in self-mutilation behaviors and on at least one occasion attempted suicide. He did not receive treatment as a teenager.

Despite these struggles, Mr. Hale graduated from high school in Ohio in 1993. He enlisted in the United States Army the following year, seeking structure and a sense of belonging. He completed basic training at Fort Leonardwood in Missouri and advanced training as a medic at Fort Sam Houston in Texas. He was then stationed at Fort Bragg in North Carolina, and throughout his career was deployed overseas to South Korea, the Sinai Peninsula, Italy, and twice to the warzone in Iraq (March 2003 to March 2004 and January 2007 to March 2008). Throughout his career, Mr. Hale earned an Iraq Campaign Medal with three campaign stars, a Meritorious Service Medal, four Army Commendation Medals, four Army Achievement Medals, six Army Good Conduct Medals, two National Defense Service Medals, a Global War on

Terrorism Expeditionary Medal, a Global War on Terrorism Service Medal, a Korean Defense Service Medal, a Humanitarian Service Medal, three Non-Commissioned Officer Professional Development Ribbons, four Overseas Service Ribbons, a Multinational Force and Observers Medal, a Combat Medical Badge, an Expert Field Medical Badge, a Parachutist Badge, an Air Assault Badge, and a Driver and Mechanic Badge. His military records reflect numerous evaluations noting his excellent service as an outstanding leader and mentor. He rose to the rank of Sergeant First Class before retiring honorably.

Mr. Hale married his first wife in 1996. She was pregnant at the time, and he took responsibility as the baby's father. The couple also had a daughter in 2000. He was stationed in Italy from 2001 to 2004, and his family lived there with him. While there, he was assigned his first tour of duty in Iraq. After completing that tour, he returned to Italy and found that his family had left. His wife took the children back to the United States and later divorced Mr. Hale. Due to the distance between them, Mr. Hale did not see his children much after his wife left him, but he still maintains good relationships with them.

Mr. Hale's service in Iraq was traumatizing. He served as a medic, treating the wounded and experiencing the devastation of war. He experienced frequent artillery fire from the enemy and treated numerous soldiers and Iraqi civilians, including many children. After his first tour in Iraq, he began experiencing symptoms of PTSD, including hypervigilance, nightmares, and intrusive memories of combat events, including the loss of friends and other casualties. These symptoms were compounded by feelings of abandonment when his wife left him, taking the children with her.

Despite his mental health struggles, Mr. Hale continued to serve his country honorably, and several years later, his PTSD symptoms were alleviated to some degree when he began

dating his second wife, who was a childhood friend. They reconnected, began dating in 2006, and married in 2007. At the time, he was still serving in the military and stationed at Fort Bragg, with the exception of a deployment to Iraq between 2007 and 2008, and an assignment in Pittsburgh from March 2013 to November 2013.

In 2014, he retired with an honorable discharge and continued to live in North Carolina with his wife. He went to school to obtain his commercial driver's license, and after completing the course, he began working for Southeastern Freight Lines as a tractor-trailer driver.

Unfortunately, Mr. Hale's underlying mental health issues persisted, and in January 2020, his wife left him due to his excessive drinking. He fell into a deep depression and experienced severe anxiety. His PTSD symptoms also intensified. As a result, he was unable to work and was placed on temporary disability. Over the following months, his mental health continued to spiral downward, and he attempted suicide on several occasions. In February 2020, while still living in his marital home in North Carolina, he made statements to his daughter about possibly harming himself and was hospitalized for an evaluation. The records from this evaluation—that occurred prior to the offense at issue here—confirm his diagnoses of major depression and "PTSD from childhood sexual abuse as well as military combat trauma." Presentence Investigation Report ("PSR") ¶79. The hospital released Mr. Hale following the evaluation and connected him with outpatient treatment services.

Mr. Hale continued to struggle and found it particularly difficult to accept the end of his marriage. In March 2020, North Carolina authorities charged him with cyberstalking his ex-wife after sending her numerous emails. He sent the emails after learning that his wife had been spending time with her ex-husband. Mr. Hale was distraught at the time and now deeply regrets sending those emails. The charge was dismissed on the condition he perform community service,

which he performed at a homeless shelter. He has had no other contact with the criminal justice system prior to the instant matter.

In August 2020, with encouragement from his mental health providers, he moved to West Virginia to stay with his mother temporarily. He continued to seek mental health treatment at the Veteran's Administration hospital in Beckley, West Virginia. His mental health, however, continued to decline. The severity of his PTSD symptoms increased, along with the symptoms of his depression, and he began hearing voices telling him he was worthless. He also had visual hallucinations and saw shadowy figures.

The offense conduct occurred on October 3, 2020 when he posted two videos to a group on the online messaging service known as KIK, in order to join a group chat. He also engaged in direct message communications with an undercover agent on October 13, 2020 in relation to that group chat. Mr. Hale originally joined KIK groups for separated and divorced adults, looking for someone—anyone—to talk to and provide him the attention he craved. He came upon the group the government has identified as dedicated to individuals interested in child pornography and joined, not because he was looking for child pornography, but because he sought attention and others in the group readily engaged with him. Initially, he thought the group's name, "you.ngshare," related to sharing adult materials, then realized it was not "you share," but "young share." He nonetheless sought to participate in the group, but not because he had a specific interest in viewing child pornography, but because he was interested in obtaining a connection with other human beings, attention, and validation. After his arrest, no child pornography was found on any of his electronic devices because he did not seek out or collect such materials. The statements he made to the undercover agent with regard to prior abuse were

5

not true and were only an attempt to say what he thought others wanted to hear and to keep them engaged. His participation in this group occurred during a period of only a few weeks.

Mr. Hale was arrested in this matter on January 7, 2021, and he has been held without bond at the D.C. Jail since that date. Serving time at the D.C. Jail is difficult at any time, but during the pandemic, serving time at the D.C. Jail has been particularly difficult and marked by frequent quarantine lock-downs.

After entering a guilty plea, the Court referred Mr. Hale for a psychosexual evaluation and risk assessment. The court-appointed evaluator, Shauna Keller, Psy.D., concluded that Mr. Hale presents a relatively low risk of reoffending. Psychosexual evaluation and Risk Assessment ("Dr. Keller") (Jan. 27, 2022) at 19. She also concluded that he does not meet the diagnostic criteria for paraphilic or pedophilic disorder and that there is no evidence he has a paraphilic or pedophilic interest or disorder, although he would benefit from mental health and sex offender treatment. Dr. Keller at 12, 20.

## Argument

When imposing a sentence, the Court must consider the Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, and mental and emotional conditions. *See* 18 U.S.C. § 3661. Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of
> imprisonment, and, if a term of imprisonment is to be imposed, in
> determining the length of the term, shall consider the factors set
> forth in Section 3553(a) to the extent that they are applicable,
> recognizing that imprisonment is not an appropriate means of
> promoting correction and rehabilitation.

18 U.S.C. § 3582. With that limitation and considering all of the purposes of sentencing, the

Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with

the purposes [of sentencing]." 18 U.S.C. § 3553(a) (emphasis added).

## I. The United States Sentencing Guidelines.

As set forth in the PSR the recommended sentencing range under the United States

Sentencing Guidelines is 108 to 135 months. However, when sentencing a defendant, the Court

"may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38,

50 (2007). Rather, the Court must treat the Guidelines "as one factor among several" that

§ 3553(a) requires the Court to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).

Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must

then "make an individualized assessment," considering the remaining factors set forth in

§ 3553(a). *Gall*, 552 U.S. at 50. Because the Guidelines merely reflect a "wholesale" view

"rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and

§ 3553(a) require the Court to tailor an individualized sentence that actually does achieve

§ 3553(a)'s objectives in the case before it. *Rita v. United States*, 551 U.S. 338, 348, 350 (2007).

Consequently, this Court must "filter the Guidelines' general advice through § 3553(a)'s list of

factors." *Id*. at 358; *see also Gall*, 552 U.S. at 52 ("'It has been uniform and constant in the

federal judicial tradition for the sentencing judge to consider every convicted person as an

individual and every case as a unique study in the human failings that sometimes mitigate,

sometimes magnify, the crime and the punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))).

Here, the government argues that a sentence within the Guidelines range is appropriate because: "The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate," to use "empirical data" to formulate "national standards." Government's Sentencing Memorandum ("Gov't Memo.") at 4 (citing *Rita*, 551 U.S. at 349). That argument, however, does not apply to the child pornography guidelines. The guidelines for child pornography offenses, set forth in U.S.S.G. § 2G2.2, were not based on empirical evidence and do not result in recommended sentences that would serve the purposes of sentencing. Sentencing courts may vary from the Guidelines based on policy disagreements alone. *Kimbrough*, 552 U.S. at 101-02 (courts may vary from Guidelines ranges based solely on disagreements with the Guidelines); *Rita*, 551 U.S. at 351 (district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations"). This Court may properly find that because the child pornography guidelines were not developed by the Sentencing Commission based on empirical data and national experience, it is not likely that the guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough*, 552 U.S. at 109-10.

Numerous courts have approved policy-based variances from § 2G2.2. *See United States v. Henderson*, 649 F.3d 955, 960 (9th Cir. 2011) ("[T]he child pornography Guidelines were not developed in a manner 'exemplify[ing] the [Sentencing] Commission's exercise of its characteristic institutional role,' . . . so district judges must enjoy the same liberty to depart from them based on reasonable policy disagreement as they do from the crack-cocaine Guidelines

discussed in *Kimbrough*."); *United States v. Grober*, 624 F.3d 592, 600-01 (3d Cir. 2010)

(finding district court did not abuse discretion by imposing policy-based downward variance

from § 2G2.2 because "the Commission did not do what 'an exercise of its characteristic

institutional role' required ─ develop § 2G2.2 based on research and study rather than reacting to

changes adopted or directed by Congress"); *United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir.

2010) (finding *Kimbrough*'s holding that "it was not an abuse of discretion" for a district court to

disagree with the crack guidelines "because those particular Guidelines 'do not exemplify the

Commission's exercise of its characteristic institutional role' . . . applies with full force to

§ 2G2.2."); *United States v. Stone*, 575 F.3d 83, 89-90 (1st Cir. 2009) (same, noting district court

may choose to agree with Congress's policy decisions as long as it recognizes its authority not

to, but the child pornography "guidelines at issue are in our judgment harsher than necessary"

and "we would have used our *Kimbrough* power to impose a somewhat lower sentence"); *see

also United States v. Halliday*, 672 F.3d 462, 474 (7th Cir. 2012) (district courts are "at liberty to

reject any Guideline on policy grounds," but defendant did "not argue that the district court was

unaware of its discretion to disagree with the [child pornography] Guidelines"); *United States v.

Regan*, 627 F.3d 1348, 1353-54 (10th Cir. 2010) (finding defendant's argument for a

policy-based variance from § 2G2.2 was "quite forceful," but no abuse of discretion because

defendant did not raise issue before district court).

      Numerous courts in this district have varied from the child pornography guidelines, in

large part based on these policy considerations. *See, e.g., United States v. Malakoff*, 09-cr-0051

(ESH) (finding that child pornography guidelines are not entitled to usual deference and

sentencing 47-year-old defendant to five years' probation for possession of "profoundly

disturbing" videos, based upon the other § 3553 factors, including lack of criminal record,

childhood sexual trauma, punishment inflicted by the conviction and sex offender registration requirement, and defendant's deep roots in the community).

In fact, last year, the Sentencing Commission reported that in fiscal year 2019, less than one third of non-production child pornography offenders received a sentence within the guideline range. United States Sentencing Commission, *Federal Sentencing of Child Pornography: Non-Production Offenses*, *avail. at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf*, at 5 (June 2021) ("2021 Report"). The majority (59%) of non-production child pornography offenders, like Mr. Hale, received a downward variance in 2019.

As the Supreme Court has noted, some sections of the Guidelines are "the product of careful study based upon extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46. However, "not all of the guidelines are tied to this empirical evidence." *Id.* at 594 n.2. Section 2G2.2 is a non-empirically based guideline that does not represent the Sentencing Commission's exercise of its characteristic institutional role and therefore does not deserve deference. *See, e.g., United States v. Baird*, 580 F. Supp. 2d 889, 895 (D. Neb. 2008) ("[B]ecause [§ 2G2.2] does not reflect the Commission's unique institutional strengths, the court affords [it] less deference than it would to empirically grounded guidelines.").

The Sentencing Commission itself has acknowledged that § 2G2.2 is not the product of "empirical data and national experience" but instead a response to the creation of mandatory minimum sentences and specific congressional directives. *See* 2021 Report at 68; *see also* United States Sentencing Commission, *Fifteen Years of Guideline Sentencing*, at 73 (Nov. 2004)

("frequent mandatory minimum legislation and specific directives to the Commission to amend the Guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress"); *see also United States v. Hanson*, 561 F. Supp. 2d 1004, 1009 (E.D. Wisc. 2008) ("To the extent that the advisory guidelines deserve continued respect from courts, that respect will be greatest where the Commission has satisfied its institutional role of relying on evidence and study to develop sound sentencing practices. [§ 2G2.2] simply does not represent that role, as the Commission itself has acknowledged."); *Baird*, 580 F. Supp. 2d at 892 ("when Guidelines are not the result of 'the Commission's exercise of its characteristic institutional role,' such as when they are not based on an empirical approach, but are instead keyed to or guided by statutory directives, a court is not presented with an 'ordinary case,' in which 'the Commission's recommendation of a sentencing range will reflect a rough approximation of the sentences that might achieve § 3553(a)'s objectives'"); *United States v. Johnson,* 588 F. Supp. 2d 997, 1004 (S.D. Iowa 2008) ("because the [§ 2G2.2 guidelines] do not reflect the unique institutional strengths of the Sentencing Commission in that they are not based on study, empirical research, and data, the Court . . . affords them less deference that it would to empirically-grounded guidelines").

Both district court judges and legal commentators have described § 2G2.2 as "seriously" flawed not only because § 2G2.2 was promulgated in a manner inconsistent with the approved practices of the Sentencing Commission, but also because § 2G2.2 does not adequately reflect important distinctions in levels of culpability among defendants. Unwarranted increases have occurred in the context of both the base offense levels and specific offense characteristics. Many of the specific offense characteristics in § 2G2.2, such as the enhancement for "number of images" (which adds up to 5 levels to the Offense Level), were enacted without any "research,

study or rationale." *Hanson*, 561 F. Supp. 2d at 1010.

While many subsections of § 2G2.2 were promulgated with little or no empirical analysis, other subsections continue to be applied notwithstanding the fact that they do not address the concerns sought to be addressed by § 2G2.2. For example, the two level specific offense characteristic enhancement for the "use of a computer," § 2G2.2(b)(6), was designed to fight the wide dissemination and instantaneous transmission in computer-assisted trafficking of child pornography, combat the increased difficulty of investigation and prosecution by law enforcement officials, minimize the increased likelihood that child pornography will be viewed by and harm children, and limit the potential for pedophiles to lure children into sexual relations through the computer. Yet, the enhancement is applied in almost every case. That is not what Congress intended.

Section 2G2.2 has also been repeatedly criticized because of its numerous other specific offense characteristics that are rarely case-specific or unique, but instead present in almost every case, including § 2G2.2(b)(2) (images containing children under twelve, a 2 level increase); § 2G2.2(b)(7) (multiple images, up to a 5 level increase); and § 2G2.2(b)(4) (material that portrays sadistic or masochistic conduct, a 4 level increase). *See United States v. Grober*, 595 F. Supp. 2d 382, 397 (D.N.J. 2008), *aff'd*, 624 F.3d 592 (3d Cir. 2010) (using the offense characteristics "to enhance the base offense level [of § 2G2.2] is irrational because logically and factually, the characteristics are simply not genuine aggravating factors. Rather, they are inherent in just about any downloading offense").

The Sentencing Commission has also recognized the flaws in § 2G2.2. Ten years ago, the Sentencing Commission released a report to Congress on the child pornography guidelines. *See* United States Sentencing Commission, *Report to the Congress: Federal Child Pornography*

*Offenses* (2012) ("2012 Report"). The Commission explained that it compiled the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions," *id.* at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability." *Id.* at ii, 323.

The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," *id.* at iii, xi, the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Id.* at 209, 323. It explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id.* at 6. Because "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id.* at 323. The cumulative enhancements addressing the content and volume of images possessed, "in addition to base offense levels of 18 or 22, result[] in guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior." *Id.*

In describing the varying degrees of culpability, the Commission reported that the "typical" child pornography case now involves images depicting "prepubescent children engaging in sexually explicit conduct." *Id.* at 84. Some offenders "acquire enormous and often

well-organized collections," sometimes up to hundreds of thousands of images; some

"intentionally collect child pornography depicting the sexual torture of children, including

infants and toddlers," *id.* at viii, 84-92; and some have collected material over "a series of

decades" beginning in the pre-Internet era, *id.* at 80. The variety of images readily available on

the Internet and found in offenders' possession ranges from "legal but sexually suggestive poses"

to extremely graphic images "depicting violence, humiliation, bondage, and bestiality." *Id.* at

80-81, 90-91. Some offenders "are very discriminating" and limit their collection by preference.

*Id.* at 81. Offenders "vary widely in their technological sophistication," with some relatively

unsophisticated offenders using widely available peer-to-peer file sharing to receive or distribute

material "in an indiscriminate manner," while others "use their technological expertise to create

private and secure trading 'communities' and to evade, and help others evade, detection by law

enforcement." *Id.* at viii, 61-62.

The Commission reported that approximately one quarter of federal offenders "received

child pornography from commercial websites, thereby fostering the commercial markets," and

one quarter engaged in "personal distribution" to another individual through bartering or trading

of images, also described as a "market." *Id.* at 98-99. There is, however, no social science

research available to support the theory that criminal punishments "have affected commercial or

non-commercial 'markets' in child pornography since the advent of the Internet and [peer-to-

peer] file sharing." *Id.* at 98.

The Commission reported that some offenders—like Mr. Hale—have "non-sexual

motivations for viewing child pornography," including "avoidance of stress or dissatisfaction

with life." *Id.* at 79. It also reported that recent studies show that "appropriate 'treatment

interventions . . .  are associated with lower rates of recidivism—some of them very significant,'"

*id.* at 278 & n.31 (quoting Center of Sex Offender Management, *The Comprehensive Approach to Sex Offender Management* 5 (2008)), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." *Id.* at 282.

The Commission reported that "not all child pornography offenders are pedophiles or engage in other sex offending." *Id.* at 104. Approximately one in three offenders sentenced under § 2G2.2 "have engaged in" what the Commission deems "sexually dangerous behavior," criminal or non-criminal, past or present, based on allegations in PSRs, arrests, and convictions. *Id.* at ix-x, 204-05. However, "the current guideline measures for offender culpability (e.g., for distribution of child pornography, number of images possessed, possession of sado-masochistic images) are generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Id.* at 204. The Commission concluded that "[t]he current sentencing scheme in § 2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." *Id.* at xx; *see also id.* at 321. The Commission asked Congress to enact legislation to provide it authority to amend the guidelines that "were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines." *Id.* at xviii, 322.

The Commission recommends that the specific offense characteristics related to the types and volume of images, distribution, and use of a computer "be updated to account more meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability (e.g., the extent to which an offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's

collecting behavior; the number of unique, as opposed to duplicate, images possessed by an

offender)," and "to reflect offenders' use of modern computer and Internet technologies." *Id.* at

xviii-xix, 322-23.

Technology has changed the nature of this offense. In the past, child pornography had to

be obtained in a risky and secretive manner for substantial sums of money, whereas today,

images of child pornography are available for free with no planning and minimal effort. As a

result, much less dangerous people commit this offense than was previously the case, even

though the guideline range is much higher than it was previously. Before widespread

dissemination on the Internet, only those bold enough to seek out child pornography by

contacting suppliers directly or through the mail were able to obtain it. In 1994 and 1995, the

government prosecuted only 90 defendants convicted of possessing, receiving, or distributing

child pornography, and only 24% used a computer. *See* United States Sentencing Commission,

*Report to the Congress: Sex Crimes Against Children* 29 (1996) ("1996 Report"). In fiscal year

2019, 95% of non-production child pornography offenders received enhancements for use of a

computer. 2021 Report at 4.

The Internet, by rendering child pornography immediately and anonymously accessible,

has "facilitate[d]. . . a new kind of crime" that in most cases would not otherwise have been

committed. *See* Andreas Frei et al., *Pedophilia on the Internet—A Study of 33 Convicted

Offenders in the Canton of Lucerne*, 135 Swiss Med. Weekly 488, 492 (2005); *see also* Jérôme

Endrass et al., *The Consumption of Internet Child Pornography and Violent Sex Offending*, 9

BMC Psychiatry 43, 44 (2009); L. Webb et al., *Characteristics of Internet Child Pornography

Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 450 (2007). The change

in technology is relevant, in part, because even as the population of child pornography offenders

has become less dangerous, punishment has greatly increased. *See* Richard Wollert, PhD, *The Implication of Recidivism Research and Clinical Experience For Assessing and Treating Federal Child Pornography Offenders: Written Testimony Presented to the U.S. Sentencing Commission* at 4-5 (Feb. 15, 2012).

In the report issued in 2021, the Sentencing Commission reiterated all of the same findings made in the 2012 report. Again, the Sentencing Commission concluded that § 2G2.2 is outdated and fails to adequate differentiate offenders. 2021 Report at 68-69. The enhancement under § 2G2.2 were designed to increase punishments for the most serious offense, but increase sentencing ranges for factors that have "become so ubiquitous that they now apply in the vast majority of case sentenced under § 2G2.2." 2021 Report at 4.

In short, because § 2G2.2 does not reflect the Sentencing Commission's unique role of relying on evidence and study to develop sound sentencing practices, and produces advisory sentencing ranges that are far greater than necessary to serve the statutory purposes of federal sentencing, courts throughout the country—and in this district—accord § 2G2.2 minimal deference at best. Mr. Hale urges this Court to adopt the same approach in sentencing him.

## II.  Guidelines Applied to Mr. Hale.

### A.  Accounting for the flawed child pornography guidelines.

One of the goals of the Sentencing Reform Act was to provide for proportionality in punishment among offenses of different seriousness. S. Rep. No. 98-225, at 45-46 (1983). The child pornography guideline fails that goal. *See, e.g., Dorvee*, 616 F.3d at 187; *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1106 (N.D. Iowa 2009); *United States v. Cruikshank*, 667 F. Supp. 2d 697, 702 (S.D.W. Va. 2009).

As applied to Mr. Hale, the specific enhancements under U.S.S.G. § 2G2.2 increase the

guideline range by 8 offense levels. *See* PSR at ¶¶ 27-29. This includes a two level increase under U.S.S.G. § 2G2.2(a)(2), for materials depicting minors under the age of twelve, PSR at ¶ 29, and a two level increase for the use of a computer, under U.S.S.G. § 2G2.2(b)(6). These two factors are present in nearly all similar cases, do not distinguish conduct among offenders, and should not be applied. Also, the addition of two offense levels for material depicting minors under the age of twelve is inappropriate given the addition of four levels for material depicting a toddler under U.S.S.G. § 2G2.2(b)(4)(A)—both of these enhancements are applied due to the age of the minors depicted in the images, accounting for the same factor. The Court should also discount the addition of a two level increase for over ten images because Mr. Hale posted only two videos—although he posted just two videos, each is counted as 75 images. The number of images involved here was very small compared to similar cases. "In fiscal year 2019, non-production child pornography offenses involved a median number of 4,265 images, with some offenders possessing and distributing millions of images and videos." 2021 Report at 4.

Without these adjustments (under twelve, computer, and number of images), which add six offense levels, Mr. Hale's offense level would be level 25, and the advisory sentencing range would be 57 to 71 months. This would be the most appropriate range to begin the consideration of a sentence for Mr. Hale, and this range supports a finding that a sentence of no more than the mandatory minimum sentenced of 60 months is appropriate.

**B. Downward Departure pursuant to 5H1.11.**

Section of 5H1.11 of the Guidelines provides: "Military service may be relevant in determining whether a departure is warranted, if the military service, individually *or in combination with other offender characteristics*, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." (Emphasis added.)

Mr. Hale served in the United States Army for twenty years, including two tours in Iraq during

the war. As noted above, he earned numerous metals, and left the military with PTSD. His PTSD

contributed to his impaired mental state at the time of the offense, which in turn led to his

conduct in this case.

Dr. Keller's evaluation explains the connection between Mr. Hale's military service and

the offense:

> The sexual abuse he endured during his early formative years and
> operational traumas within the military appear to be prominent
> contributors to Mr. Hale's internalizing (i.e., depressive symptoms)
> and externalizing (i.e., self-injurious behaviors and alcohol use)
> problems. Despite the persistent and pervasive depression he has
> experienced since adolescence, he enlisted in the United States
> Army with the promise of a successful career. The military
> appeared to provide Mr. Hale with a structured environment that
> allowed him to thrive and rewarded him for his effectiveness.
> Unfortunately, his limited range of coping strategies hindered his
> ability to effectively manage the depression and distress he
> experienced following the dissolution of both of his marriages. The
> distress Mr. Hale experienced, in the absence of alternative coping
> skills, contributed to a progressive deterioration that included
> heavy alcohol use and his involvement in maladaptive sexual self-
> stimulation (i.e., online sexual communication) that became
> increasingly transgressive, and eventually, unlawful.

Dr. Keller at 19. Without acknowledging Dr. Keller's independent expert report, the government

claims that Mr. Hale's military service is "wholly irrelevant" to the instant offense, citing

unsubstantiated and false allegations made by his stepdaughter. Gov't Memo. at 7. As discussed

below, the court should reject the government's suggestion that the Court rely on those false

allegations. The facts related to the instant offense are as stated in Dr. Keller's report, and

supported by Mr. Hale's medical records—Mr. Hale suffered from PTSD and that PTSD

contributed to the instant offense.

This connection and Mr. Hale's 20 years of service (including as a medic during a war) in

connection with other factors (including his lack of a prior record and his impaired mental health due to the abuse he suffered as a child) make his military service a factor that is "present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." *Cf. United States v. Davis*, 20 F.4th 1217, 1219 (8th Cir. 2021) (upholding downward variance from guideline range of 46 to 57 months, to a sentence of time served (2 months) on the charge of attempted coercion or enticement of a minor, for a 20-year decorated military veteran with no prior record). For this reason, a downward departure is warranted.

### III. The Nature and Circumstances of the Offense.

Mr. Hale does not dispute that the conduct at issue was horrendous. He recognizes that any distribution of child pornography re-victimizes the children involved, but he did not seek to harm any children and, at the time, saw his conduct as role-playing and fantasy for the purpose of engaging with others. He now recognizes the severe harm that sharing these materials causes, and particularly given the abuse he suffered himself, he is deeply ashamed that he participated in this conduct. Mr. Hale asks only that the Court take into account the limited nature of his participation in the charged offense, which occurred on October 1, 2020, and the discussion with the undercover agent, which occurred on October 13, 2020.

### IV. History and Characteristics of Mr. Hale.

Mr. Hale is a 48-year old decorated veteran with no prior record. This background and his mental health at the time of the offense is strong support for a variance. At the time of the offense, he was suffering from PTSD and severe depression. He was seeking relief from these conditions, although in a wholly inappropriate way. While this does not lessen the harm to the victims, it does reduce the need for incarceration. Mr. Hale's conduct arose out his mental health disorders and emotion distress, and as Dr. Keller has confirmed, not out of a pedophilic disorder.

Incarceration may serve the purposes of punishment or general deterrence, but Mr. Hale's background demonstrates that those purposes will be sufficiently served by the mandatory minimum term of 60 months, particularly given that he has never before been incarcerated.

## V.  Purposes of Sentencing.

The Court must impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, affords adequate deterrence and protects the public, but under the circumstances of this case, a lengthy prison term is not necessary to serve these purposes. Mr. Hale has spent the past seventeen months at the D.C. Jail. As the Honorable Rosemary M. Collyer has recognized, "incarceration at the D.C. Jail is qualitatively more severe than [Bureau of Prisons] custody." *See United States v. Carter*, 2018 WL 6700568 at n.2 (Dec. 20, 2018). This experience has had a significant effect on Mr. Hale and serves as a substantial deterrent—particularly given the conditions during the pandemic, which resulted in long periods of medical quarantine, effectively isolation.

Mr. Hale also must register as a sex offender, with the publication of that information to the community and his friends and neighbors. His sexual offender designation will effectively make him a societal outcast for the next 25 years. He will be banned from living in many neighborhoods and even entire towns. *See, e.g.*, May 21, 2013 *New York Times* Op-ed, "Sex Offender Village"; October 1, 2013, *New York Times*, "Restricted Group Speaks Up, Saying Sex Crime Measures Go Too Far". Mr. Hale's name and address will be readily available on the Sex Offender Registry, something anyone with a computer can view. Finding employment as a registered sex offender also will be extremely difficult.

As several courts have recognized, the collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just

21

punishment. *See, e.g., United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after *Gall*, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," *id.* § 3553(a)(2)(A), and "adequate deterrence," *id.* § 3553(a)(2)(B)); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of prosecution).

A lengthy prison term also is not necessary for deterrence. The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime and Justice: A Review of Research 2829 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*,

33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The government claims, that "both Congress and the courts have recognized the high recidivism rates for these types of offenders." Gov't Memo. at 10 (citations omitted). In fact, recent reports from the Sentencing Commission demonstrate that offenders charged with non-production child pornography offenses are far less likely to recidivate that offenders charged with other offenses. In the 2021 Report, the Commission found that non-production child pornography offenders had a recidivism rate of 27.6%. 2021 Report at 65. By comparison, the Commission has found that offenders charged with firearm offenses have a 68% recidivism rate; drug traffickers have a 50% recidivism rate, and those charged with fraud have a 34% recidivism rate. *See https://www.ussc.gov/sites/default/files/pdf/research-and-publications/backgrounders/rg_recidivism-series.pdf.*

The Sentencing Commission also has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (2004). According to "the best available

evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T.

Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison

J. 48S, 50S-51S (2011). Nor does lengthy imprisonment of child pornography possessors have

any deterrent or preventive effect on the production or dissemination of child pornography.

There is no evidence "remotely supporting the notion that harsher punishment would reduce the

flow of child pornography on the Internet." *Beiermann*, 599 F. Supp. 2d at 1103-04 ("[W]e

cannot sentence Internet users and sharers of child pornography fast enough or long enough to

make a dent in the availability of such material on the Internet," and while deterrence is a

"laudable" goal, it "is not being achieved according to any empirical or other evidence in this

case or, for that matter, empirical evidence in any other case or source that I am aware of."). The

Sentencing Commission acknowledges that there is no social science research supporting the

theory that criminal punishments "have affected commercial or non-commercial 'markets' since

the advent of the Internet and [peer to peer] file-sharing." 2012 Report at 98.

A primary assumption underlying Congress's actions with respect to the child

pornography guideline has been that possessors of child pornography are likely to sexually abuse

children. This belief is contrary to the empirical research. In the 2021 Report, the Sentencing

Commission found that 4.3% of child pornography offenders released form incarceration or

place on probation in 2015 were rearrested for a sex offense within three years. 2021 Report at 7.

*See also* Helen Wakeling et al., *Comparing the Validity of the RM 2000 Scales and OGRS3 for

Predicting Recidivism by Internet Sexual Offenders*, 23 Sexual Abuse: J. Res. & Treatment 146,

164 (2011) (child pornography offenders "do not, as a group, present a significant risk of

escalation to contact sexual offenses."); Jérôme Endrass et al., *The Consumption of Internet

Child Pornography and Violent Sex Offending*, 9 BMC Psychiatry 43 (2009) (study that

followed 231 child pornography offenders for six years after initial offenses found that only two

offenders (0.8%) committed a contact offense, and only nine offenders (3.9%) committed a

non-contact sexual offense, and concluded that "the consumption of child pornography alone

does not seem to represent a risk factor for committing hands-on sex offenses . . . at least not in

those subjects without prior convictions for hands-on sex offenses"); Michael C. Seto & Angela

W. Eke, *The Criminal Histories and Later Offending of Child Pornography Offenders*, 17 Sexual

Abuse 201, 207-08 & tbl. III (2005) (finding that 1.3% of those who had committed child

pornography offending only recidivated with contact sex offenses; "our finding does contradict

the assumption that all child pornography offenders are at very high risk to commit contact

sexual offenses involving children."); L. Webb et al., *Characteristics of Internet Child*

*Pornography Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 463 (2007)

(finding Internet-only offenders "significantly less likely to fail in the community than child

molesters," and concluding that "by far the largest subgroup of internet offenders would appear

to pose a very low risk of sexual recidivism").  As one district court put it, "the empirical

literature [] generally concludes that there is little—if any—evidence of a direct correlation

between viewing child pornography and the viewer's commission of 'contact' sexual offenses."

*United States v. Marshall*, 870 F. Supp. 2d 489, 492 (N.D. Ohio 2012), *aff'd*, 736 F.3d 492 (6th

Cir. 2013).

   Not only are child pornography offenders at low risk to re-offend in general, but

Dr. Keller found that Mr. Hale in particular is a low risk for reoffending, and with treatment,

Mr. Hale—which he can receive if sentenced to the mandatory minimum 60-month term—his

risk his further reduced. The Commission's research demonstrates that employment, education,

lack of criminal history, and family ties and responsibilities all predict reduced recidivism. *See*

*Measuring Recidivism* at 12-13; *Recidivism and the "First Offender,"* at 8 (2004). Mr. Hale's lack of a criminal record, age, and education, as well as the nature and circumstances of his crime, strongly support the conclusion that with treatment during his term of incarceration and as a condition of supervised release, he is unlikely to reoffend.

## VI.  The Need to Avoid Unwarranted Disparities.

As noted above, the sentencing range recommended by the Guidelines is 108 to 135 months. However, the Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In this case, a variance is necessary to avoid unwarranted disparity between Mr. Hale and other defendants. *See Gall*, 552 U.S. at 55 (in imposing a sentence of probation, district court appropriately "avoid[ed] unwarranted similarities"). In fiscal year 2019, only 30.0% of defendants sentenced under § 2G2.2 nationwide received a sentence within the guideline range. 2021 Report at 23. More specifically, only 25.3% of offenders, like Mr. Hale, who were sentenced for distribution offenses were sentenced within the guideline range, while 73.6% received a below the range sentence. *Id.* For all of the reasons discussed above, the Court should avoid an unwarranted disparity by sentencing Mr. Hale below the recommended sentencing range.

## VII. The government's recommendation.

Without addressing the findings of Dr. Keller—an independent evaluator appointed by the Court—the government asks the Court to ignore the evidence before it, reject the recommendation of the Probation Office, and impose a sentence twice as long as the required mandatory minimum term. In support of its request, the government cites to Mr. Hale's text messaging with the undercover officer on October 13, 2020, and false allegations made by his

stepdaughter several years ago. The facts and evidence demonstrate that the Court should reject the government's request.

First, the statements Mr. Hale made to the undercover officer were not true and what he said did not actually occur. Mr. Hale made these outrageous, but untrue, statements as part of a desperate attempt to find a human connection. The government's reference to these statements as "information he reported to the undercover agent," Gov't Memo. at 7, 10, is misleading. He did not make a report to police; he made false and salacious statements to an anonymous person on the internet, who turned out to be an undercover officer. As the government knows, there is no evidence that he in fact abused his eight-year-old daughter, as he falsely claimed to the undercover officer. In fact, he was serving in Iraq when his daughter was eight years old, and his wife had full custody of his daughter. Moreover, his daughter has never made any allegation of abuse.

Second, the allegation that Mr. Hale sexually abuse his stepdaughter is false. At the time she first made the allegations against him, she was a troubled young girl. When government agents interviewed her after Mr. Hale's arrest in this case, she did not repeat the most serious of the allegations. As the government notes, several years ago, she claimed that Mr. Hale forced her to perform oral sex on him. When interviewed in 2021, however, she said that he touched her buttock once when she was sleeping, but she said there were no other instances where Mr. Hale touched her. She also stated that with regard to the incident when he touch her buttock, Mr. Hale had explained that he thought it was her mother who was sleeping in the bed and he was trying to wake her. In 2021, his stepdaughter made statements about Mr. Hale seeing her undressing, but he never purposefully saw her unclothed. Her statements are explained by her animosity toward Mr. Hale due to his relationship with her mother, not by actual misconduct by Mr. Hale. When

she first made the allegations, police and child protective services investigated. Both concluded that no action against Mr. Hale was appropriate.

Notably, Mr. Hale's wife did not believe the allegations—she continued to stay with him for several years following the allegation, and his stepdaughter's grandparents, who knew his stepdaughter and the circumstances under which she made the allegations, did not believe the allegations. The government mischaracterizes the evidence by suggesting that the grandparents "corroborated" the government's claim that Mr. Hale has a history of interest in children. Gov't Memo. at 6. These grandparents merely reported that their granddaughter made a false allegation against Mr. Hale, reporting that they did not believe the allegation. A false allegation corroborates nothing. Despite acknowledging at the beginning of its sentencing memorandum that the grandparents did not believe the allegation and that his stepdaughter later denied the allegation, Gov't Memo. at 2, at the end of the memorandum, the government states this allegation as if it were true, claiming "Hale evaded law enforcement detection for years before his arrest in this matter in spite of sexually abusing his own daughter years ago." Gov't Memo. at 10. That statement is false. Mr. Hale did not evade law enforcement—law enforcement investigated and found the allegation not credible—and Mr. Hale did not sexually abuse anyone. His stepdaughter repudiated this claim herself when interviewed in 2021, demonstrating her lack of credibility. In short, there is no evidence to support the allegations because they are untrue.

The government's claims that Mr. Hale "has had a sexual interest in children over a long period of time," Gov't Memo. at 6, and "had sexual interest in children during the time he was in the military," id. at 7, are also false and not supported by the evidence. Dr. Keller specifically found that Mr. Hale has had a long history of interest in adult females and that there is "no indication that he had a pervasive sexual interest in or preference for prepubescent children, previously or currently." Dr. Keller at 12. The government's statement is baseless.

The government asks the Court to ignore Dr. Keller's findings and the Probation Office's conclusion that Mr. Hale has a low risk of recidivism based only on the false claim that he has "history of sexual interest in children," and that his lack of a record demonstrates an "ability to evade law enforcement." Gov't Memo. at 7. Incarcerating Mr. Hale based on false and unsubstantiated claims that were never charged would violated due process, and the Court should ignore the government's attempt to obtain a lengthy sentence based on unfounded fearmongering.

In addition, the government's argument that Mr. Hale should be incarcerated for a longer period because he was abused as a child, Gov't Memo. at 11 (referring to "self-reported history of sexual abuse"), is offensive. Mr. Hale was raped when he was eight years old. He is now 48 and has never assaulted anyone. Incarcerating him for a longer period now because he endured that incident—and 40 years of emotional trauma because of that incident—would be a gross injustice.

 The Court should sentence Mr. Hale based on facts and evidence. The facts are that he shared two videos, participated in a group chat for a few days in October 2020, and made statements to the undercover agent that were salacious, but not true. There is no evidence that Mr. Hale committed any other abuse or misconduct. Mr. Hale has served his country honorably and the instant offense occurred only because of the trauma he has suffered and his impaired mental health. While treatment is appropriate, a lengthy prison sentence is unnecessary.

## Conclusion

For all of the foregoing reasons, a sentence of no more than the mandatory minimum term of 60 months would be sufficient but not greater than necessary to serve the purposes of sentencing.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER


    /s/

_____

MARY MANNING PETRAS
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500